UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID DUNCAN,

    Plaintiff,

v.                                                         CASE NO: 8:17-CV-40-T-30TGW

GEICO GENERAL INSURANCE
COMPANY,

    Defendant.
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment (Dkt. 27) and Plaintiff's Response in Opposition (Dkt. 36). The Court, upon review of the motion, response, and record evidence, concludes that Defendant's motion should be granted and final judgment should be entered in Defendant's favor because no reasonable jury could conclude, based on the undisputed material facts, that Geico acted in bad faith in the handling of Duncan's uninsured motorist claim.

## BACKGROUND

Plaintiff David Duncan filed this first-party bad faith action against Defendant Geico General Insurance Company, alleging that Geico acted in bad faith in the handling of his uninsured motorist ("UM") claim. The UM claim against Geico arose from an automobile accident that occurred on November 12, 2013. Duncan brought the present bad faith action against Geico after the suit styled *David Duncan v. GEICO Gen. Ins. Co.*, Case No.: 2014-

CA-1657-0 in the Tenth Judicial Circuit, in and for Polk County, Florida, resulted in a jury verdict in favor of Duncan in the amount of $300,000, which was then reduced to judgment in the amount of the UM policy limits of $10,000.

Geico issued liability policy number 4265100992 (the "Policy") to Duncan on October 13, 2013, and it was in effect on November 12, 2013. The Policy provided UM coverage in the amount of $10,000 per person/$20,000 per occurrence. The Policy required, in relevant part, a "[p]ermanent injury within a reasonable degree of medical probability" before an award for non-economic damages could be paid under the UM coverage. (Dkt. 27 at Ex. D).

On November 12, 2013, Duncan was involved in a motor vehicle accident with Isabel Gomez-Diego. The accident occurred when Diego pulled out in front of Duncan causing Duncan to strike Diego's vehicle. Diego fled the scene and Duncan followed her to her home. The police arrived and Diego was arrested. Diego did not carry bodily injury insurance coverage.

The next day, on November 13, 2013, Duncan reported the accident to Geico and provided a description of the accident. On November 14, 2013, Geico sent correspondence to Diego, requesting that she contact Geico to provide further information about the accident. Geico also requested a copy of the police report from the police department.

On November 20, 2013, Geico received a letter of representation from attorney Karl Pansler, advising that he represented Duncan in connection with the accident. The letter requested insurance disclosures pursuant to Florida law. On December 23, 2013, Geico sent the requested insurance disclosures to Pansler.

On March 24, 2014, Geico received a demand package dated March 21, 2014, from Pansler, seeking payment of Duncan's $10,000 UM policy limits within thirty days. The demand enclosed medical records from Duncan's treatment following the accident. The demand package also provided medical bills that indicated Duncan had incurred $3,612.00 in medical bills.

The medical records enclosed with the demand reflected that Duncan was seen at the Watson Clinic Urgent Care Department for his injuries on November 13, 2013. Duncan told his treating physician, Giovaninna De La Cruz, MD that he was suffering from pain on the right side of his body and in his neck. His right wrist, elbow, and knee were in pain. Dr. De La Cruz's diagnosis described Duncan's injury as "[n]eck pain" and noted in the report that Duncan had refused any pain medication but was given a prescription for muscle relaxers. X-rays were taken by Michael Angelo Addonizio, MD of Duncan's cervical spine. Dr. Addonizio noted some mild cervical spine straightening in Duncan's neck but stated it was otherwise normal and an "unremarkable examination." (Dkt. 27 at GLC 001353). Dr. De La Cruz released Duncan to work with no restrictions or limitations on November 14, 2013.

The medical records enclosed with the demand indicated that on November 25, 2013, Duncan was treated by chiropractor Scottie M. Ison with the Cleveland Heights Chiropractic Clinic. Ison's diagnosis was that Duncan had suffered a cervical sprain/strain, cephalgia (headaches), thoracic sprain/strain, and lumbar sprain/strain. Duncan was advised to use ice therapy and a stretching regimen to help the healing process. Duncan was prescribed muscle relaxers to help treat his neck pain.

The enclosed medical records indicated that Duncan continued to be treated by Ison through December 16, 2013. On December 2, 2013, Ison indicated "improvement in the objective findings when compared to the last visit" and that Duncan was "making good progress." *Id.* at GLC 001365. On December 10, 2013, Ison reported that Duncan's "response to care is favorable." *Id.* at GLC 001367. Duncan advised that "his symptoms have improved" and he reported "decreased neck and shoulder pain." *Id.* Duncan complained of "burning sensations involving the right shoulder and a tremor in the right hand." *Id.* On December 16, 2013, the last treatment record from Ison included in the demand, Ison noted that Duncan was still suffering from headaches, leg pain, back pain, and neck pain. Duncan would continue with the same program as long as progress was seen.

The enclosed medical records indicated that Duncan had an MRI of his neck on January 20, 2014, and an x-ray of his right shoulder on January 27, 2014. Chatrachai Virapongse, MD evaluated the MRI of Duncan's cervical spine and found that the "cervical discs are normal" and it was an "[u]nremarkable cervical spine." *Id.* at GLC 001336. Prashant Desai, DO reviewed the three x-ray images of Duncan's right shoulder and determined there were no signs of acute boney changes, fractures, or dislocations. *Id.* at GLC 001337.

On January 27, 2014, Duncan saw Dr. Desai at the Watson Clinic complaining of right shoulder pain. Dr. Desai diagnosed Duncan with a right shoulder rotator cuff sprain and right upper extremity tremors. Dr. Desai also noted that Duncan's right shoulder x-ray was negative and indicated that he discussed with Duncan physical therapy for rotator cuff strengthening and to see if that would help Duncan's right arm tremors. Dr. Desai noted that

he wanted Duncan to obtain a neurological evaluation as well. Dr. Desai discussed with Duncan having a cortisone injection, however Duncan declined.

The demand records further showed that on February 10, 2014, Duncan was evaluated by a neurologist Eberto Pineiro, MD, who diagnosed Duncan as having a brachial plexus stretch injury, a mild tremor, and weakened grip in the right hand.

On February 24, 2014, Duncan treated with Dr. Desai; according to the records, Dr. Desai noted that Duncan had "been evaluated by neurology who had determined that he may have a brachial plexus stretch injury, but given more time [sic]. He has to follow up with neurology again in another 5 months." *Id.* at GLC 001348. Dr. Desai prescribed a future treatment plan of strengthening exercises for Duncan's rotator cuff. Dr. Desai indicated that he would see Duncan "as needed." There were no additional medical records provided with the demand package.

Upon receipt of the demand, the file was transferred to Geico examiner Jessica Maslyn for further handling. Maslyn reviewed the medical records, medical bills, outstanding personal injury protection benefits ("PIP"), and concluded that it appeared that Duncan's injuries were soft tissue in nature. On April 10, 2014, Maslyn offered $1,500 to settle Duncan's UM claim.

On April 11, 2014, Pansler sent a letter to Maslyn indicating that he believed that the brachial plexus stretch injury and upper extremity tremors were "worth well more than $10,000 available through Mr. Duncan's policy." (Dkt. 27 at Ex. L). Pansler indicated that the demand for the policy limits expired on April 20, 2014, and if the policy limits were not

tendered by then, he would file suit. Pansler did not provide any additional medical records for Geico to evaluate.

Upon receipt of Pansler's April 11 letter, Maslyn again reviewed the medical records that had been provided with the initial March 21, 2014 demand. Maslyn responded to Pansler's April 11 letter by again offering to settle Duncan's UM claim for $1,500.

On April 24, 2014, Pansler filed a civil remedy notice ("CRN") on Duncan's behalf against Geico. The CRN noted that Geico had "failed to make a satisfactory settlement offer." (Dkt. 27 at Ex. P).

On May 12, 2014, prior to the expiration of the CRN cure period, Geico received notice that Duncan had filed a UM lawsuit against Geico on April 24, 2014.

On June 13, 2014, Geico examiner Fawn Allen timely responded to the CRN and offered to settle Duncan's UM claim for $1,500. Allen noted that Geico had reviewed the police report and demand packet and all of the medical records that were submitted and had determined that Duncan had been treated for only soft tissue injuries and that his PIP coverage had paid out $3,195.93, leaving $6,804.07 in available PIP benefits. Allen also noted that the cervical MRI taken the day after the accident and the x-rays taken of Duncan's right shoulder were "pristine." (Dkt. 27 at Ex. R). Allen stated that with "the limited treatment and the available PIP benefits" that the $1,500 was "in line with such limited out of pocket expenses." Allen noted that, although she was willing to compromise to settle Duncan's UM claim, she did not value the claim to be worth the $10,000 UM limits. *Id.* Pansler did not respond to this letter.

On September 2, 2014, Geico offered the full $10,000 UM policy limits based on new information learned about Duncan's injuries and that he was seeking additional treatment. Accordingly, on September 14, 2014, Geico offered the $10,000 UM policy limits via a proposal for settlement in the underlying action. Duncan did not accept the proposal and continued to litigate the underlying action, which resulted in a jury verdict of $300,000.

Now, Geico moves for summary judgment on Duncan's bad faith claim. Geico argues that it did not act in bad faith as a matter of law because the record is undisputed that Duncan never provided it with any medical evidence of permanent, physical injury during the sixty-day cure period. The Court agrees and will enter judgment in favor of Geico as a matter of law.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.    Florida First-Party Bad Faith Law

Under Florida law, an insured may assert a claim for first-party bad faith against his insurer for "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(1)(b)(1). Before pursuing a claim under this statute, an insured must first provide sixty-days' written notice to the insurer, to

allow the insurer to correct the circumstances giving rise to the claim. *See* Fla. Stat. §§ 624.155(3)(a) & (3)(d). To cure a violation, the insurer must tender "the amount owed pursuant to the express terms and conditions of the policy." *Talat Enters., Inc. v. Aetna Cas. & Surety Co.*, 753 So. 2d 1278, 1282 (Fla. 2000).

The determination as to whether an insurer has acted in good faith is based on the "totality of the circumstances," which, among others things, considers whether the insurer investigated the facts surrounding the event, gave fair consideration to reasonable settlement offers under the circumstances, and settled where possible if a reasonably prudent person would have settled. *Macola v. GEICO*, 953 So. 2d 451, 455 (Fla. 2006) (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). In pursuing settlement in an UM claim, the Florida Supreme Court has explained that "to fulfill the duty of good faith, an insurer does not have to act perfectly, prudently, or even reasonably. Rather, insurers must 'refrain from acting solely on the basis of their own interests in settlement.'" *Messinese v. USAA Cas. Ins. Co.*, 622 Fed.Appx. 835, 839 (11th Cir. 2015) (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 58 (Fla.1995)).

Notably, to determine bad faith courts must focus on the actions taken by the insurer, considering all of the circumstances known to it, "at the time such actions were taken." *Cousin v. Geico Gen. Ins. Co.*, 166 F. Supp. 3d 1290, 1299 (M.D. Fla. 2015). "The insurer has a right to deny claims that it in good faith believes are not owed on a policy. Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, there is no cause of action if the denial was in good faith." *Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1124 (11th Cir. 2016) (citing *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla.

2000)). The relevant time period for determining whether an insurer acted in bad faith in handling a first party UM claim is prior to the expiration of the sixty-day CRN cure period. *See Cadle*, 838 F.3d at 1126.

## II. Non-economic Damages Recoverable in a UM Claim

Geico's motion for summary judgment focuses on the narrow issue of the "permanency" of Duncan's injuries. Under Florida law, "the legal liability of an uninsured motorist coverage insurer does not include damages in tort for pain, suffering, mental anguish, and inconvenience," i.e., non-economic damages, unless the injury consists of (a) significant and permanent loss of an important bodily function; (b) permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement; (c) significant and permanent scarring and disfigurement; or (d) death. Fla. Stat. §§ 627.727(7) & 627.737(2)(a)-(d). Geico incorporated this provision into the Policy. Therefore, the Policy does not provide coverage for noneconomic damages absent a showing that the insured suffered loss of an important bodily function, permanent injury, significant scarring or disfigurement, or death.

## III. Analysis

Geico agues that its actions taken during the CRN sixty-day cure period were not in bad faith because it timely reviewed Pansler's demand package, including the enclosed medical records, and determined that there was no medical documentation that Duncan suffered a permanent injury within a reasonable degree of medical probability. Based on the records, Geico concluded that Duncan's injuries were soft tissue in nature and that he still had $6,804.07 in PIP benefits available. Notably, Duncan's MRI and x-rays were normal

and there was no evidence that Duncan was recommended for surgery or had any out of pocket expenses or lost wages as a result of the underlying accident.

In a recent case, the Eleventh Circuit held that "[n]oneconomic damages are available under an insurance policy only if the plaintiff incurs a 'permanent injury,' which must be established 'within a reasonable degree of medical probability' within the cure period." *Cadle v. GEICO General Ins. Co.*, 838 F.3d 1113 (11th Cir. 2016); *see also Harris v. GEICO General Ins. Co.*, 961 F. Supp. 2d 1223, 1231 (S.D. Fla. 2013), *aff'd*, 619 Fed.Appx. 896 (11th Cir. 2015) (holding that "the entitlement to non-economic damages does not turn on whether [plaintiff] or her counsel believes or anticipates a finding of permanent injury. Rather, the standard is whether the injury and the permanency thereof can be established within a reasonable degree of medical probability.").

In *Cadle*, the Eleventh Circuit affirmed the district court's entry of judgment as a matter of law in Geico's favor. Cadle had been injured in a car accident. In her demand letter to Geico, her insured, she requested her UIM policy limits of $75,000 and included her medical records. 838 F.3d at 1116. Geico concluded that she had not suffered a permanent injury and offered her $1,000 to settle her claim. Cadle then filed her CRN, which noted that "she was still under the care of her treating physician and a neurosurgeon with whom she had discussed surgical intervention . . ." *Id.* at 1117. Geico did not increase its offer, again noting that there had been no designation of a permanent injury. *Id.* Over a year after the CRN cure period, Cadle underwent surgery and, subsequently, filed suit against Geico alleging bad faith. The jury returned a verdict in her favor. *Id.* at 1118.

In affirming the district court, the Eleventh Circuit noted that "at no time during the cure period did Cadle produce to Geico medical evidence of the permanency of her injury." *Id.* at 1126. Quoting the district court, the Eleventh Circuit reiterated that:

> Despite numerous opportunities, Cadle's attorney never provided any evidence of a permanent injury and never even attempted to address the threshold issue [of permanent injury], except to note that his client was considering surgical intervention. This possibility of surgical intervention is not, however, notice of permanent injury. Absent evidence of a permanent injury, there was no basis for Geico to value Cadle's UM claim at or above $75,000. Accordingly, *there was no credible evidence presented to the jury to support a finding of bad faith*.

*Id.* at 1127 (emphasis in original).

In *Harris*, the district court similarly entered judgment as a matter of law in Geico's favor notwithstanding the jury verdict because Harris had not shown that she sustained a permanent injury within a reasonable degree of medical probability during the CRN sixty-day cure period. *See* 961 F. Supp. 2d at 1230-32. The relevant facts, as reiterated by the Eleventh Circuit in its opinion affirming the district court, are as follows:

> During that 60-day period, Harris again demanded the policy limit on 14 September, and provided GEICO an MRI revealing bulging discs and herniations and notice that she would undergo a percutaneous discectomy (a brief, outpatient procedure performed in approximately 15 minutes from which the patient is sent home with a band-aid over the entry site). On 1 October, GEICO presented another offer below the policy limit; Harris responded by sending GEICO additional medical records and bills on 6 October, in which she informed GEICO of $54,082.15 in medical expenses for the percutaneous discectomy (PD) procedure and related expenses. On 8 October, GEICO raised its offer to an amount still well below the policy limit, which Harris rejected.

619 Fed.Appx. at 897.

Notably, during the bad-faith trial, Harris admitted she did not provide a medical note with a permanency rating during the safe-harbor period. Instead, Harris relied on her

-12-

non-medical insurance expert's testimony that an insurance adjuster should have been able to deduce permanency from the kind of medical treatment Harris received and her condition. *Id.* at 899. The Eleventh Circuit agreed with the district court that Harris failed to present any expert medical testimony of a permanent injury "within a reasonable degree of medical probability." *Id.*; *see also Cousin*, 166 F. Supp. 3d at 1299 (granting summary judgment in Geico's favor because: "Ms. Cousin fails to provide any evidence that GEICO knew or should have known of any objective medical findings establishing that she sustained a permanent injury as a result of the accident 'within a reasonable degree of medical probability.' Nor did she claim to have a permanent injury, or support such a claim by expert medical testimony that established within a reasonable degree of medical probability that she suffered a permanent injury. Therefore, GEICO cannot be said to have acted in bad faith for failing to consider non-economic damages Ms. Cousin may have suffered in its initial offer."); *Wojciechowski v. Allstate Property and Casualty Ins.*, Case No. 8:14-cv-3176-MSS-TBM (M.D. Fla. Dec. 27, 2016) (granting summary judgment in Allstate's favor in a first-party bad faith action and concluding that: "Allstate's refusal to tender the $100,000 UIM policy limits during the Cure Period, which was based on the medical records it possessed and the fact that Mr. Wojciechowski incurred no out-of-pocket expenses, was not made in bad faith.").

Based on the binding precedent of *Cadle* and the persuasive authority of *Harris*, *Cousin*, and *Wojciechowski*, the Court concludes that Geico did not act in bad faith in handling Duncan's UM claim as a matter of law. It is undisputed that Geico was not presented with any medical evidence prior to the expiration of the sixty-day cure period that

Duncan suffered a permanent injury within a reasonable degree of medical probability as a result of the underlying accident. Rather, the medical records reflected that Duncan suffered from sprain/strain injuries to the neck and back, headaches, a right rotator cuff sprain, a brachial plexus stretch injury, and right hand tremors. The medical records also indicated that the diagnostic studies performed showed all normal findings and there was no recommendation that Duncan undergo any future surgery.

The record is also undisputed that, prior to the expiration of the cure period, Duncan had not incurred any out-of-pocket expenses or had any lost wages. The medical bills totaled only $3,612.00, with approximately $6,400 available in PIP coverage. Despite the foregoing, Geico evaluated the information Duncan presented to support his UM claim and offered $1,500 to settle.

Duncan's response in opposition argues that because the medical records referenced "brachial plexus injury," "noticeable tremors in his right arm and hand, and weakness of grip strength," Duncan did not have to provide medical expert testimony because these conditions are "patently obvious" permanent injuries. (Dkt. 36). This argument is similar to the argument in *Harris* that the insurance adjuster should have been able to deduce permanency from the kind of medical treatment received and is similarly unavailing because there is no link between the treatment or condition and a permanent injury "within a reasonable degree of medical probability." In other words, there is no record evidence from Duncan's neurologist, Dr. Pineiro (who he consulted with only once at the time of the CRN) that the brachial plexus stretch injury and tremors were permanent, required surgery, or that any future treatment for same was necessary. As noted by Dr. Desai in the medical records, Dr.

Pineiro said that Duncan "may" have a brachial plexus injury, but he needed more time. There were no diagnostic tests conducted to confirm the existence of the brachial plexus stretch injury or tremors. And, even assuming, for the sake of argument, that Duncan did have a brachial plexus stretch injury, tremors, and weakness of grip strength, there is nothing in the record placing Geico on notice *during the cure period* that these injuries or conditions were permanent in nature. Thus, Geico's offer of $1,500 was reasonable and summary judgment should be entered in its favor.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant's Motion for Summary Judgment (Dkt. 27) is granted.
2. The Clerk of Court is directed to enter Final Judgment in favor of Defendant and against Plaintiff.
3. The Clerk of Court is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on October 13, 2017.

*[Signature]*
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record